April 10, 2017                                                                    1

```
 1 ‖                    UNITED STATES DISTRICT COURT
   ‖                    EASTERN DISTRICT OF MICHIGAN
 2 ‖                          SOUTHERN DIVISION

 3 ‖   UNITED STATES OF AMERICA,

 4 ‖                    Plaintiff,
   ‖      -v-                              Case No. 15-20040
 5 ‖
   ‖   LESHOUN DEANDRE BYRD,
 6 ‖
   ‖                    Defendant.
 7 ‖   _____/

 8 ‖                          SENTENCING

 9 ‖
   ‖           BEFORE THE HONORABLE JUDITH E. LEVY
10 ‖               UNITED STATES DISTRICT JUDGE

11 ‖                       APRIL 10, 2017

12 ‖
   ‖   APPEARANCES:
13 ‖
   ‖   For the Plaintiff:   Carl D. Gilmer-Hill
14 ‖                        Julie A. Beck
   ‖                        United States Attorney's Office
15 ‖                        211 West Fort Street, Suite 2001
   ‖                        Detroit, Michigan 48226
16 ‖
   ‖   For the Defendant:   Steven F. Fishman
17 ‖                        615 Griswold, Suite 1125
   ‖                        Detroit, Michigan 48226
18 ‖
19 ‖
20 ‖
21 ‖
22 ‖
23 ‖           To Obtain a Certified Transcript Contact:
   ‖           Jeseca C. Eddington, RDR, RMR, CRR, FCRR
24 ‖                 Federal Official Court Reporter
   ‖                 United States District Court
25 ‖      200 East Liberty Street - Ann Arbor, Michigan 48104
```

1                              **I N D E X**

2

MISCELLANY

3

         Proceedings................................3
4        Certificate...............................48

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

April 10, 2017                                          3

1                    **P R O C E E D I N G S**

2            THE CASE MANAGER:  We're on the record in the matter

3    of United States of America vs Leshoun Byrd, case number

4    15-20040.  Counsel, please place your appearance on the record

5    and you all may be seated.

6            MS. BECK:  Good morning, your Honor.  Julie Beck on

7    behalf of the United States.  And my colleague, Mr.

8    Gilmer-Hill, is in the hallway.  May I step out and grab him?

9            THE COURT:  Certainly, certainly.

10           MR. FISHMAN:  And Steve Fishman on behalf of Mr.

11   Byrd.  Good morning, Judge.

12           THE COURT:  Good morning.  And welcome to you and

13   your client.  Please be seated.  We'll wait for Mr.

14   Gilmer-Hill.  There he is.  All right.

15           Well, this is the date and time that has been set for

16   sentencing in the case United States of America v Leshoun

17   DeAndre Byrd.  And Mr. Byrd plead guilty to Counts 1 and 3 of

18   a three-count indictment which charged him with conspiracy to

19   possess with intent to distribute and distribute marijuana.

20   And he did so without a Rule 11 plea agreement.

21           Mr. Byrd at the time of your guilty plea, Count 2 was

22   dismissed by the Government.  So I don't think we need to do

23   anything with respect to Count 2.  Your guilty plea was taken

24   under -- was accepted at that time.  There's no plea

25   agreement.  And now we have a presentence investigation report

April 10, 2017                                      4

```
 1    as well as a sentencing memo that your lawyer submitted to
 2    take into consideration.  But do you wish to maintain your
 3    plea of guilty?
 4            THE DEFENDANT:  Yes.
 5            THE COURT:  Okay.  And at the time of your guilty
 6    plea, you were represented by Mr. Fishman and I see that he's
 7    here with you today.  At that time I asked you if you were
 8    satisfied with his representation and you indicated that you
 9    were.
10            THE DEFENDANT:  Yes, I was.
11            THE COURT:  Okay.  And is that still the case today?
12            THE DEFENDANT:  Yes.
13            THE COURT:  I have no reason to doubt that.  You have
14    a Sixth Amendment right to effective assistance of counsel.
15    So it's important for the integrity of the process to know
16    that that right of yours has been met.
17            So we will now proceed with the sentencing hearing.
18    I've had an opportunity to review the presentence report that
19    was prepared by the probation department on January 10th of
20    2017 and then revised, I believe, pursuant specifically to
21    some issues that you and your lawyer brought up.  But it was
22    revised on February 13th of 2017.
23            Ms. Vu is here in the courtroom with us today and I'd
24    like to thank you for your work on the report.  It was
25    thorough and I thought that your very careful responses to the
```

USA v Byrd - Case No. 15-20040

April 10, 2017                                                    5

1   objections are also helpful to me in understanding the nature

2   of those objections and how the presentence report is of help

3   in responding to them.

4          So Mr. Fishman, I could tell that you received a copy

5   of the presentence report.  Did you show that to your client?

6          MR. FISHMAN:  I did.

7          THE COURT:  Okay.  And Mr. Byrd, did you have a

8   chance to review the report?

9          THE DEFENDANT:  Yes, I did.

10         THE COURT:  And Mr. Gilmer-Hill, I didn't receive a

11  sentencing memorandum from you and I tried to reach out

12  yesterday through my law clerk as I was working on this.  And

13  she indicated that you were not going to submit one.  That's

14  -- you didn't submit one then, I presume?

15         MR. GILMER-HILL:  That's correct, your Honor.  The

16  Government had actually at the time of the original

17  presentence report also submitted objections and all of the

18  issues raised by the Government were, in fact, addressed.

19         THE COURT:  Okay.

20         MR. GILMER-HILL:  We received the presentence report.

21  We have no changes to it in this revised edition.

22         THE COURT:  Okay.  And I can just address to you that

23  it is often still helpful for me to get a sentencing

24  memorandum from the Government.  Because particularly in this

25  case, if I were to be sentencing within the guidelines, the

April 10, 2017

```
 1    guidelines are 324 months to 405 months, which is a
 2    magnificent range and an astronomically high place to start
 3    consideration.  And so it can be very helpful for me to know
 4    what the Government's position is as I'm working through the
 5    thought process of what is appropriate in this particular
 6    case.  So I just suggest that it's something you consider for
 7    the future.
 8            Also, I do have an issue -- I'd be interested -- we
 9    have the issue of the preliminary order of forfeiture that I
10    understand Mr. Byrd takes issue with.  And Ms. Beck filed a
11    brief, which I was able to read everyone's brief and a
12    supplemental brief.  And one question that I have for Ms. Beck
13    is that Mr. Fishman makes the argument that the Government
14    permitted Mr. Byrd to keep $50,000 from the sell of the
15    property.
16            I don't think there's estoppel or anything like that.
17    You're not prohibited from saying that there's still
18    additional money judgment -- an additional money judgment
19    owing in this case.  But what is your response to that
20    argument?
21            MS. BECK:  Thank you, your Honor.  The response to
22    the argument is in forfeiture matters it's always -- there's
23    always a cost benefit analysis that goes into a decision to
24    resolve something.  The Government had tied up the property
25    903 McLean that was owned by Mr. Byrd with what's called an
```

April 10, 2017

1  affidavit of interest.

2          Mr. Byrd approached the Government and indicated that

3  he had desire to sell the property and the Government was

4  preventing him from being able to do that because of this

5  affidavit it had filed in the chain of title.

6          So as is very common in forfeiture practice, if

7  something occurs like that far in advance of filing a civil

8  case or wrapping up anything in the criminal case, we hadn't

9  sued that property and we didn't want to further alienate it.

10 And so what we typically do is agree that we will lift that

11 affidavit or remove it from the chain of title and then

12 negotiate a resolution where the proceeds are either held in

13 escrow or perhaps they agree at that time to forfeiture of it.

14         So my response is simply that return of $50,000 to

15 Mr. Byrd at the time was something that another AUSA agreed to

16 do who was on this case before me.  Not that I would have done

17 anything differently.  But he agreed to do to move the case

18 forward.  And so at the time, I mean, I can't speak for what

19 was in his mind, but it could very well be that he wasn't in a

20 position to litigate it, that he didn't want to sue in a civil

21 case and then argue about whether all of the money that was

22 used to buy the property was, in fact, proceeds of drug

23 trafficking.

24         So very often you just make a decision that is of

25 benefit to the Government and the defendant to resolve it

April 10, 2017

1    preliminarily instead of litigating it.

2         THE COURT:  Okay.

3         MS. BECK:  So I would put to the Court that that's

4    all that happened in this case.  It wasn't a indication that

5    the Government believed only $122,000 of the sell proceeds

6    were, in fact, arguably proceeds or property tracing to

7    proceeds of drug trafficking.

8         THE COURT:  Well, maybe what we should do is work our

9    way through the objections regarding the sentence and then

10   conclude the hearing with the preliminary order of forfeiture

11   and the dispute on that issue, unless you wish to respond at

12   this time.

13        MR. FISHMAN:  No, I can wait.

14        THE COURT:  I think I'd rather just hold that off.

15        MR. FISHMAN:  I filed a response so the Court knows

16   -- you know what I'm thinking.

17        THE COURT:  I do.

18        MR. FISHMAN:  And I can add some things about my

19   discussions with Mr. Gray, who was the AUSA back then.  But we

20   can talk about it later.

21        THE COURT:  Okay.  All right.  Well, then I received

22   several objections that were filed by Mr. Fishman on behalf of

23   Mr. Byrd.  And what I'd like to do is work through those.  And

24   then I'll ask that the Government address the Court on a

25   sentence it is seeking.  Mr. Fishman will have an opportunity

USA v Byrd - Case No. 15-20040

April 10, 2017

1    to speak.  And then Mr. Byrd, if you wish to say something on

2    your own behalf, you may.  But you're not required to.

3            So Mr. Fishman, some of -- well, would you like to

4    address the Court on any outstanding objections where you were

5    not satisfied with the probation department's response?

6            MR. FISHMAN:  Well, there were two --

7            THE COURT:  Which would be all of them possibly.

8            MR. FISHMAN:  Yeah.  I'm not satisfied with anything.

9            THE COURT:  Okay.

10            MR. FISHMAN:  Other than the summary of Mr. Byrd.  I

11    thought that was accurate.  That he works everyday and hasn't

12    been in trouble in seven years and all that stuff.  The two

13    issues that caused the guidelines to go crazy were the use of

14    premises for drugs.  And the second one was leadership.  And

15    the leadership is a huge deal, as far as I'm concerned, based

16    on my sentencing memo, my own thoughts of the case.  Because

17    if the Court agreed with me, then I'd say Mr. Byrd is eligible

18    for the safety valve.

19            THE COURT:  The problem with the safety valve is he

20    has to have cooperated.  There are a number of factors that

21    are not met, at least --

22            MR. FISHMAN:  Only one.

23            THE COURT:  Okay.  But that's --

24            MR. FISHMAN:  But it's not cooperation that's

25    required.  It's a sit down where -- I've been through them.

April 10, 2017                                            10

1    It's a charade, quite frankly.  You sit down.  You say

2    everything you did, which they already know.  And the reason

3    we didn't do it is because it was no sense wasting everybody's

4    time.

5          What I'd asked in my sentencing memo was if the Court

6    finds it's no leadership, which I think you should, then I'd

7    just ask for a brief adjournment so he can comply with this

8    what I think is a fairly nominal thing.  It's not cooperation.

9    That's not what they're asking for.

10          THE COURT:  Okay.

11          MR. FISHMAN:  They just -- he has to sit down and he

12   has to tell what he did, which, you know, I'd say -- maybe two

13   or three occasions I've had U.S. attorneys who required it.

14   Most of the time, especially in the old days, nobody bothered

15   with it.  If he qualified, he wasn't a leader, didn't have

16   guns, there wasn't any violence --

17          THE COURT:  Well, there were guns.

18          MR. FISHMAN:  Well, they were found in his house in

19   2016.

20          THE COURT:  Okay.

21          MR. FISHMAN:  So it had nothing to do with that.

22   Having a gun is irrelevant.  It's whether it's part of the

23   actual offense.

24          THE COURT:  Yeah.  And I don't know the answer to

25   that.  I won't hold it against him.  It wasn't charged and

1    it's not considered related conduct in any way here.  But I'm
2    just saying there were guns.
3            MR. FISHMAN:  Okay.  By the way, which were legal for
4    him to have at the time.
5            THE COURT:  I understand that.
6            MR. FISHMAN:  All right.
7            THE COURT:  So let's just start with objection number
8    one, which is an objection to paragraph 15 where he's listed
9    as a leader or an organizer.  And I read both obviously your
10   objection but also your sentencing memo.
11           And I think, in fact, that the probation department
12   is correct in that as I heard the testimony from the witness
13   box right there of McWherter and Hale, Mr. Byrd was in --
14   either in Arizona or I don't know if he -- always where he
15   was.  But he was a central part of who they communicated with
16   about when these trips were going to be made, how the
17   marijuana -- when it was going to be transported back to
18   Michigan.  And he was at the core of this operation for the
19   period of time he was participating.
20           MR. FISHMAN:  I didn't hear the testimony.  I wasn't
21   here for the trial.  If that's what they said, that's what
22   they said.  But there's an awful lot of other factors it seems
23   to me that have to do with the application note for that lays
24   out these criteria.  And to me, he doesn't really qualify in
25   any of them.  They very well may have communicated with him.

April 10, 2017                                                    12

1   So what.  It's obvious who the leader was.

2           THE COURT:  Yeah.  But not only that they

3   communicated with him, but that was directing and he was

4   working side by side with Derrick White in determining how

5   this operation was going to take place.

6           MR. FISHMAN:  Well, if he was, then Derrick White

7   must have stumbled into it for the three years before Mr. Byrd

8   was even involved in this.  According to the testimony, or at

9   least what I read -- remember, I don't have the testimony --

10  this thing started in 2006.  White was behind everything.

11  These other guys were driving for him.  They were doing

12  whatever they were doing.

13          Mr. Byrd came in and he participated.  There's no

14  doubt.  But he's not the leader of this event.  And when you

15  look at the -- who recruited accomplices?  Byrd?  No.  White.

16  Who claimed the right to the larger share of the fruits of the

17  crime?  I mean, are we kidding?  Look at what they took from

18  White and look at what they took from Byrd.  Nothing from Byrd

19  other than the lien that was placed on the house.

20          The degree of control and authority.  Was he

21  exercising control and authority or was he just passing on

22  information?  You know, the leadership to me is leading

23  somebody.  It's not being a private in an army.  And it seems

24  clear to me that this all was going on for years and then he

25  got involved and was involved for less than a year.  He didn't

1    get a larger share of the fruits of the crime.  There's no

2    evidence he got a large share.

3             THE COURT:  Well, as I heard the testimony, McWherter

4    and Hale thought they were working for White and Byrd.  That's

5    who they -- that's how they conceived the conspiracy to be

6    undertaken is that at least during the time that Byrd was

7    there and they spoke about him, they said that he was central

8    to obtaining the -- they said they didn't know where the

9    marijuana originally came from but that he knew that sort of

10   thing.

11            MR. FISHMAN:  He may have.  But they certainly didn't

12   know in 2006, '7, '8 or beginning of '9 either and they were

13   getting it.  And Mr. White was the one that was in charge of

14   it.  Byrd may have known, too.  But I just don't see how these

15   two guys are able to -- whatever it is they said about Mr.

16   Byrd, how does that offset the criteria that are in the

17   application note?  The fact that he knew, so what.

18            THE COURT:  My understanding was it was more than he

19   knew.  He was directing what should be done, when it should be

20   done, and was central to that.  He also -- with respect to the

21   money laundering conspiracy, there's the vehicle that he had

22   $17,000 in June of 2009 purchased -- used to purchase a 2004

23   BMW 645 with the assistance of a nominee, Shakita Byrd.

24            And according to paragraph 12 of the presentence

25   report, it was titled in her name.  She went to the Secretary

April 10, 2017                                14

1   of State to provide the completed vehicle title, proof of

2   insurance.  And so he was the only person involved in that

3   part of that conspiracy with a nominee.  And then in September

4   of 2010, he trades that in for a 2009 BMW 750 LI.  And with a

5   trade in value of 20,000.

6          So as I see it, I think he meets the criteria in the

7   application note for participating as a leader or organizer.

8   And furthermore, it's not that there is only one leader or

9   organizer, as I understand the sentencing guidelines.  There

10  can be more than one in a conspiracy.

11         MR. FISHMAN:  If I can just -- you've already ruled,

12  but I just want to address the money laundering part of it.

13  What money laundering case doesn't involve exactly that?

14  Somebody takes something and they put a nominee.  That doesn't

15  make him a leader.  That's what money laundering is.  You get

16  a nominee.  The nominee takes the lousy money and they buy

17  something, whether it's a car or whatever.  But does that make

18  you a leader?  If that does --

19         THE COURT:  No.  But it shows his control over the

20  money, that he had access to $17,000 of this money.  You're

21  saying, well, Derrick White was -- he was the boss of this

22  whole operation and Mr. Byrd was solely doing what he told

23  them.

24         MR. FISHMAN:  Precisely.

25         THE COURT:  And the way I'm looking at the facts and

1    as I heard them at the trial and as I've read them in the

2    presentence report, I think he was central to -- during the

3    time of his participation to organizing, directing, giving

4    directions to others.  Not as much as Mr. White, but I think

5    he meets the definition.  So that will be -- that objection is

6    denied.

7            The issue of the dwellings, I don't even think this

8    one's a close call.  I think the leadership role is a much

9    closer call than this.  But here, the residence at 1108 West

10   Maddock Road in Phoenix was utilized -- that's where McHale

11   and -- or McWherter and Hale went and talked about Byrd being

12   there and participating in directing them as to what to do.

13           He wasn't driving across the country with the

14   marijuana.  He got to fly out to Las Vegas or somewhere else

15   and drive over there along with Derrick White.  And then reap

16   the benefits of the money either being driven there or the

17   marijuana being driven away.

18           Mr. Fishman, do you wish to say anything further?

19           MR. FISHMAN:  No.  It sounds like you've ruled.  I

20   said what I said in --

21           THE COURT:  Well --

22           MR. FISHMAN:  Again, I didn't have the benefit of the

23   trial.  I didn't hear.

24           THE COURT:  Now, the other thing is the condominium

25   in Detroit, that was -- if I understand the condition it was

April 10, 2017                                     16

1      in, it was not in a condition to be used for living.  It was

2      used for almost exclusively for dropping off and picking --

3      dropping off drugs and picking up money.

4             MR. FISHMAN:  If that's what they testified to,

5      that's what they testified to.  All I can go by was what I had

6      in front of me.

7             THE COURT:  Okay.  Fair enough.  Anything further?

8             MR. FISHMAN:  Well, I had other objections.  But they

9      weren't guideline related objections.  I had other objections

10     to the presentence report.  But I don't know that --

11            THE COURT:  I don't know that any of them --

12            MR. FISHMAN:  They don't have anything to do with the

13     guidelines, that's for sure.

14            THE COURT:  Yeah.  And I think your objections are

15     thoughtful and I've taken them into consideration.  So thank

16     you.  But I don't think the presentence report needs to be

17     amended on the basis of the objections to some of the language

18     regarding whether your client is a threat or not a threat or

19     whether to -- well, it's no indication that it's a threat.

20     But whether deterrence is part of the statute.  It has to be

21     addressed.  And I think the probation department addressed it

22     appropriately.

23            MR. FISHMAN:  Okay.

24            THE COURT:  So would you like to address the Court on

25     the sentence you're seeking at this time?

April 10, 2017                                                    17

1           MR. FISHMAN:  Well, sure.  I'm kind of restricted.

2   The sentence I'm seeking I suppose is 120 months because

3   that's the best I can get if he's a leader.  And if you want

4   me to go through all the stuff I wrote in there, I did it on

5   purpose.  I do believe firmly, as I said in my sentencing

6   memo, that for a long time -- and it's the lawyers' fault, not

7   the judges.  But everybody's been standing around just talking

8   about these marijuana cases like it's a real drug and it's

9   really harmful and things of that nature.

10          And I included all that stuff for the Court because I

11  do honestly believe I think however much time Mr. Byrd does,

12  probably while he's there, the substance will be legal.

13  Certainly in my lifetime, and I'm old.  And I just think that

14  the Court has the opportunity -- I mean, just consider what

15  the guideline range with probation is and just consider the

16  cases you see in here.  Homicides.  You know, people carrying

17  around pounds and pounds of heroin.

18          You're talking about a guideline range of almost 30

19  years?  I mean, are you kidding?  I mean, seriously, it's

20  ludicrous.  And I do honestly believe -- I mean, I know for a

21  fact from my own experience that there's no danger.  I've

22  listened to some of the conversation from some of the people

23  who say that somehow marijuana is a danger.  It's a gateway

24  drug and it's a bunch of crap as far as I'm concerned.

25          I can speak on my own behalf and from everybody I

April 10, 2017

```
 1    know, there's only three things that happen when you smoke
 2    weed.  Music sounds better.  Right.
 3              THE COURT:  Well, I don't think this is about smoking
 4    weed.
 5              MR. FISHMAN:  But it is ultimately.
 6              THE COURT:  Ultimately it's about people -- the bales
 7    and bales of marijuana that came from Mexico to Arizona, from
 8    Arizona to here.  Hits the streets and the music sounded
 9    better.
10              MR. FISHMAN:  And they ate Sara Lee cakes and sex was
11    good.  I mean, that's the three things that you can say.
12              THE COURT:  But that's -- okay.  Go ahead.
13              MR. FISHMAN:  My point is that I think it's important
14    to recognize what substance we're talking about.  And I
15    think that the -- if you don't mind me telling you a brief
16    story, happened in Judge Gilmore's courtroom about 20 years
17    ago.  You mentioned bales of weed.  Ron Morgan and I are
18    trying a case with Wayne Pratt in front of Judge Gilmore.
19              I won't tell you which AUSA walked in.  But Wayne
20    decided to bring a bunch of bales of weed and it was in their
21    smelling and, of course, it was weed.  And particular AUSA was
22    pretty high up in the office in those days asked me, Fishman,
23    look at all that weed.  And I asked him, well, did you smoke
24    weed when you were in college and in law school?  He said
25    yeah.  I said how did you think they were bringing it in, one
```

1   joint at a time?

2           I'm trying to address what you're saying.

3           THE COURT:  I understand what you're saying.

4           MR. FISHMAN:  The fact that there was a lot of money

5   to be made, the fact that, you know, Lamborghinis or whatever

6   it was that people were buying --

7           THE COURT:  Aston Martins, Lamborghinis.

8           MR. FISHMAN:  Well, those all have to do with the

9   Co-defendant, by the way.  But in any event, that really has

10  nothing do with the seriousness of the offense.  That's

11  because it's illegal.  That's why there's all this money to be

12  made.  When it becomes legal, like it is to some degree in all

13  the states except for eight in this country, then Altria will

14  make money and the big, you know, companies will make money.

15          There will still be money made.  The difference is it

16  will be taxed.  Everybody will still be doing the same thing

17  they're doing now, smoking weed.  And somebody will make a lot

18  of money and the Government will make money because they'll

19  collect taxes on it.

20          So I don't see the distinction, you know, to say that

21  this is a serious offense because they made a lot of money out

22  of it.  You saw what my comments were about that.  That's

23  because it's illegal.  And it's because it's persisted to be

24  illegal in the federal system despite what the states have

25  done throughout this country and despite the fact I think it

April 10, 2017                                                    20

 1   was 13 percent of adults say they smoke weed now, which
 2   doesn't count all the people that, like me and everybody else
 3   I know, that has done it in the past and suffered no medical
 4   consequences about it.
 5        And then, of course, we have other things about Mr.
 6   Byrd in this case that the Court should consider.  When I
 7   talked about the delay in indictment, I was very clear on
 8   saying the Government can do whatever they want.  There's a
 9   statute of limitations.  I don't know why they did it and it
10   doesn't really matter why they did it.  But the good news for
11   Mr. Byrd is that by doing that and waiting five years from the
12   seizure with McWherter and another couple of years before --
13   now you see who Leshoun Byrd is.  You see who he is.
14        I mean, he goes and gets some vocational training.
15   He doesn't really have a record other than drunk driving seven
16   years ago.  And what does he do?  He works for Roto Rooter for
17   13 bucks an hour.  That's Leshoun Byrd.  If you didn't give
18   him a day, he's going to walk out of here tomorrow.  I mean,
19   you can't not give him day obviously.  But if you didn't, he'd
20   be the same person he's been these last few years cleaning out
21   drains and working for Roto Rooter.
22        And the thought, the notion of him getting 120
23   months, which is the most I would hope the Court's
24   considering, to me is absurd.  It really is.  It's a sad
25   commentary on what's going on in the system.  It's not the

April 10, 2017                                                    21

1    Court's fault.  As I said in the sentencing memo, you can't do

2    anything about that.  You can't overrule the mandatory

3    minimum.  You can't tell Congress they're full of baloney.

4            But you can, I think through a sentence here,

5    acknowledge what Mr. Byrd really is, who he really is.  The

6    length of time that gave you an opportunity to see who he

7    really is.  Because he sure had time to screw up, right?  If

8    they -- if they had -- if he were a criminally inclined

9    person, it would seem to me, at least, that in the last seven

10   years you'd see him in some kind of trouble.  Right?  Either

11   it would be with another bag of weed or it would be with

12   something because he'd have criminal mentality.  He doesn't.

13           And you can tell from the family background, it's a

14   good family.  He just got involved in something if he had to

15   do it all over again of course he wouldn't do it.  Because he

16   sees what the consequence is.

17           So you know, I just think given all of the facts that

18   are in the presentence report and all the things about Mr.

19   Byrd and the notion of what the offense is, I mean, I don't

20   think the Court can avoid commenting or at least considering

21   that this is marijuana.  This is not heroin.  It's not

22   cocaine.  It's not all these pills that the doctors hand out

23   like it's candy.  This is just marijuana.

24           And whatever way the Government tries to portray it

25   as, I don't care how many bales and bales it is, it boils down

1    to the marijuana go on out in the street and people like me

2    when I was young and like any number of people smoke it.

3    That's what we're talking about.  No one's getting sick.  No

4    one's becoming a junky.  They're just smoking weed.

5              So I ask the Court to give a sentence of 120 months.

6    If that's the best we can get, that's the best I can ask for.

7    I also ask you because of his drinking problems in the past

8    and because he smoked his share of weed, too, that the Court

9    recommend the RDAP program.

10             THE COURT:  Okay.

11             MR. FISHMAN:  And I'm asking, of course, for

12   voluntary surrender.  I can't even think of an argument why it

13   wouldn't apply to a guy like this.  And that's it.  Mr. Byrd

14   knows he can speak but he and I have spent many, many hours

15   talking together and I know he doesn't have anything to say to

16   the Court.  He understands he has the right to.

17             THE COURT:  Okay.  All right.  But I'll still ask him

18   and hear from him.  Thank you, Mr. Fishman.  Mr. Gilmer-Hill,

19   we were going to go in the other direction.  I realize that I

20   said that earlier.  But go right ahead if you'd like to

21   address the Court.

22             MR. GILMER-HILL:  Thank you, your Honor.  Your Honor,

23   I'll try and -- I'll try and speak quickly.  There's actually

24   a fair amount that I have to say and I hope the Court will

25   indulge a little bit.  Much of my comments I had expected to

April 10, 2017

1    -- I was unclear whether there might be a need to respond to

2    the objections that defense raised.  And I think that the

3    context of the responses to those objections actually provides

4    the Court a lot of background information about Mr. Byrd.

5         THE COURT:  Okay.

6         MR. GILMER-HILL:  That actually is contrary to what

7    Mr. Fishman presents.  Firstly, I'll start with this

8    suggestion -- actually suggestion and objection by the defense

9    as to probation department's proper characterization of this

10   as a serious offense.

11        The defense in their sentencing memorandum, at

12   several different points suggest otherwise as they did today

13   verbally.  In fact, the quote that I focused on, there's a

14   point in the sentencing memorandum where Mr. Byrd through Mr.

15   Fishman suggests that there's nothing serious about conspiring

16   to possess marijuana -- possessing marijuana, selling

17   marijuana, or using marijuana.  Of course, the Government

18   differs.

19        And in that context with regard to the seriousness of

20   this offense, first has broad points.  I'll point out this is

21   a serious offense because it, in fact, involved drug money and

22   transactions as the Court knows range in single transactions

23   from half a million dollars in cash to one and a half million

24   dollars in cash.  That's the amount roughly that was being

25   transported locally in Arizona to make these purchases of

April 10, 2017

1   marijuana.  Because that's the quantity of marijuana that was

2   involved.

3           As you know, this isn't just a case about people

4   distributing to users on the street.  This was a case where

5   there was, in fact, high tech solenoid controlled compartments

6   in vehicles.  Large vehicles, expensive vehicles have been

7   modified just for this purpose.

8           The Palmer Street condo that the Court itself

9   observed as being part of this case also reflects the

10  seriousness of this offense and the seriousness and depth of

11  Mr. Byrd's involvement.  The Palmer Street condo was the

12  location where is reflected in the presentence investigation

13  report and the discovery in the case independent of any

14  testimony at trial.

15          That Palmer Street condo was where the majority of

16  the deliveries occurred.  That Palmer Street condo had a

17  barricaded door and separately a reinforced front entry door

18  specifically to limit access.  That Palmer Street condo was

19  the location where there were appliances stacked up against

20  the door and where McWherter and Mr. Hale made their

21  deliveries and even purchased a separate vehicle for the

22  particular reason of going to that Palmer Street condo.

23          That Palmer Street condo is the location where

24  firearms were observed during the conspiracy upon delivery.

25  It's reflected in the discovery.  And that's independent of

April 10, 2017                                          25

1   the firearms that were seized from Mr. Byrd at the time of his

2   arrest.  As was reflected in the discovery, Mr. Hale explained

3   that on at least one occasion he saw firearms, two firearms on

4   the table.

5          THE COURT:  Yeah.  And those are additional reasons

6   for denying the objection related to the use of a premises as

7   a drug -- what is the actual language.  As a --

8          MR. GILMER-HILL:  Maintaining the premises for the

9   distribution in furtherance of the drug trafficking.

10         THE COURT:  Yeah.

11         MR. GILMER-HILL:  But in addition to applicability of

12  the points for maintaining the premises, I'm hoping that the

13  Court understands the seriousness of the offense where we are

14  talking about the primary location where the drugs were being

15  delivered and the presence of firearms.  And here, in terms to

16  have depth of Mr. Byrd's involvement, that condo was Mr.

17  Byrd's condo.

18         THE COURT:  Right.

19         MR. GILMER-HILL:  It was independent of the house --

20  as the Court did observe, there was a house in Arizona that

21  Mr. McWherter and Mr. Hale primarily used.  This condo was the

22  location where on every occasion the drugs were delivered to

23  this condo, Mr. Byrd was present in terms of his leadership

24  that does match.  And I understand the Court has suggested

25  that it views Mr. Byrd's role as being different from Mr.

April 10, 2017                                        26

```
 1      White.  But the Government respectfully differs.
 2              THE COURT:  Was Mr. Byrd -- when does the
 3      Government's discovery show he began his involvement with the
 4      conspiracy?
 5              MR. GILMER-HILL:  That is not as clear as it is as to
 6      Mr. White.  But I will note that that condo, the lease for the
 7      condo runs from 2007 --
 8              THE COURT:  That's right.
 9              MR. GILMER-HILL:  -- to 2010.
10              THE COURT:  Yeah.
11              MR. GILMER-HILL:  I will note that with regard to Mr.
12      Byrd's involvement and his travel, the records that were
13      obtained show his travel consistent with the travel during the
14      heart of the conspiracy.  They show travel in 2007, a flight,
15      I believe.  A flight and maybe a car rental as well.
16      Beginning in 2007, at the end of 2007, and extending actually
17      past 2010 into 2012 with regard to travel out west.
18              As you heard during the trial -- and I'll even
19      specify further.  When I say travel, I'm talking about
20      consistent patterns.  During the trial it was explained by Mr.
21      McWherter, I believe, that the pattern was for Mr. White and
22      Mr. Byrd to fly from Detroit while others in the organization,
23      lessers in the organization either drove or stayed in Arizona,
24      like Mr. Johnson --
25              THE COURT:  Mr. Johnson stayed there, yeah.
```

April 10, 2017                                                27

```
 1            MR. GILMER-HILL:  Mr. White and Mr. Byrd flew back
 2    and forth.  And when they did, they flew to LA and to Vegas
 3    and then drove to Phoenix in addition to occasionally flying
 4    to Phoenix.
 5            And so when I talked about flying out west, I'm
 6    talking about flying there and then renting a car and
 7    traveling to Phoenix and the mileage for those cars being
 8    consistent with that during the heart of the conspiracy.
 9            THE COURT:  And I think --
10            MR. GILMER-HILL:  If you like, I can be more
11    specific.
12            THE COURT:  No, I don't -- I --
13            MR. GILMER-HILL:  I suspected not.
14            THE COURT:  I don't think it's necessary.  I
15    appreciate what you're saying and I think that those are
16    precisely the reasons that I think that the Court denied the
17    objection on leadership and organizing role as far as the use
18    of a dwelling in furtherance of the conspiracy.
19            MR. GILMER-HILL:  Thank you, in that regard, your
20    Honor.  But I also mention these points so that there's not a
21    misunderstanding as to distinctions as to the level of
22    involvement between Mr. Byrd and Mr. White.
23            The trial that was before the Court focused upon
24    Tashun White who was specifically one of the nominees involved
25    with laundering Derrick White's money.  And so the Court did
```

```
1    hear much more information about Derrick White and is more
2    familiar with that.
3              THE COURT:  Yes.
4              MR. GILMER-HILL:  But that's not to suggest that
5    information is not available as to Mr. Byrd.
6              THE COURT:  I understand.  So what is the sentence
7    that the Government is seeking in this case?
8              MR. GILMER-HILL:  Your Honor, I can jump ahead to
9    that.  But I -- if you will permit me just a little bit of
10   leeway as I flash through --
11             THE COURT:  Sure.
12             MR. GILMER-HILL:  -- some of the points that I just
13   wanted to touch upon.  As to some of these suggestions with
14   regard to the -- even the extent of -- well, I think the
15   comments thus far touch upon the length of time of Mr. Byrd's
16   involvement and the extent of his actual travel to Arizona and
17   his presence in Detroit for the receipt of the marijuana at
18   that condo on each of the occasions that it was delivered
19   there.
20             Some of the other points that were touched upon in
21   the trial and the Court has touched upon have to do with the
22   amount of money that was generated.  And I'll remind the court
23   that that amount was actually four to six times the amount of
24   money that Mr. McWherter and Mr. Hale made.  And they were
25   making a hundred dollars per pound.
```

1           And that money, the volume of money that Mr. White

2    and Mr. Byrd were receiving is consistent with some of the

3    information that the Court is aware of both from the trial and

4    from the presentence investigation report.  Shoun's nickname

5    was Gucci.  There was D and there was Gucci.  And the reason

6    that Shoun's nickname was Gucci was because of his tendency to

7    wear Gucci belts.  Different Gucci belts.  He was a very

8    expensive dresser like Mr. White because he could afford to do

9    so.  He, perhaps, is not as obvious with regard to some of his

10   expenditures but that's not to suggest that he didn't have

11   money.

12           I think that as the Court draws its attention to some

13   of the things that it has at least looked at on the surface

14   with regard to the car purchases, for instance.  Significantly

15   that $17,000 in cash that was paid for the first BMW of course

16   did occur in 2009 and was during a period of time that Mr.

17   Byrd was supposedly unemployed.  Likewise, for that subsequent

18   purchase.  But I'd like to draw attention to the fact that

19   that subsequent BMW was a $75,000 car.

20           So in addition to trading in the first vehicle, Mr.

21   Byrd brought additional cash to the table to purchase that yet

22   more expensive car.  He purchased the house.  The house he

23   purchased in his father's name also during this period that he

24   was unemployed was $40,000.  Cash attributable to Mr. Byrd.

25   So it's not as outlandish as some of the expenditures of Mr.

April 10, 2017                                    30

1    White.  But certainly that unexplained income is there.

2           THE COURT:  I think that's why we're here.

3           MR. GILMER-HILL:  During his statements at his plea

4    hearing, he acknowledged as much as well with regard to the

5    money that was used for purchasing vehicles in excess of

6    $10,000 was drug trafficking money.

7           The review -- during the case, the review of Mr.

8    Byrd's bank records also revealed suspicion cash deposits to

9    his bank accounts.  Approximately $113,000.

10          THE COURT:  Uh-huh.

11          MR. GILMER-HILL:  Between 2009 and 2012.  So again, I

12   keep returning to it.  The distinction between Mr. Byrd and

13   Mr. White is not as Mr. Fishman suggests.

14          THE COURT:  And I think we can go beyond that now

15   because that decision has been made.  And it's made in part

16   for all of the reasons that you've just set forth as well as

17   what the probation department very concisely inserted in

18   response to each of the objections.

19          MR. GILMER-HILL:  And I speak in depth just so that

20   that depth is understood to support the guideline range that

21   applies.

22          THE COURT:  Okay.

23          MR. GILMER-HILL:  I note that the guideline range is

24   approximately four to six times the -- four to six times the

25   criminal exposure of Mr. McWherter and Mr. Hale, which is

1    appropriate.  I mean, their role was less.  The amount of

2    money that they received was less.  And so their criminal

3    exposure, though still significant, is less, about four to six

4    times less.

5            THE COURT:  How does it compare to Mr. Johnson?

6            MR. GILMER-HILL:  Well, about four to six times of

7    Mr. Johnson as well.  Mister -- actually, the Court may

8    recollect Mister -- actually it's more -- Mr. Johnson's range,

9    I believe, was around 160 months.  And he was received a

10   ten-year sentence.

11           THE COURT:  Yes.

12           MR. GILMER-HILL:  And obviously even at that ten-year

13   sentence, in terms of taking into account the sentences of the

14   Co-defendants and ensuring that there's not disparity --

15           THE COURT:  I'm not just asking you the guidelines

16   because I can read that and it's right here in the presentence

17   report on page 4.  What I'm asking you is to articulate the

18   difference in the role that Mr. Byrd and Mr. Johnson had.

19           MR. GILMER-HILL:  Oh.  And Mr. Johnson's guideline

20   range was 168 to 210.

21           THE COURT:  Yes.

22           MR. GILMER-HILL:  With regard to the role, Mr.

23   Johnson's role was that to stay in Arizona, as opposed to

24   flying back and forth, his role was to locally transport the

25   million dollars, roughly million dollars worth of cash at a

1    time and to transfer and rewrap bales of marijuana.

2         He was a worker essentially for Mr. White and Mr.

3    Byrd.  That is also reflected even with regard to the fact

4    that for Mr. Johnson, his money laundering activity was

5    serving as a nominee for Mr. White on a Lamborghini as opposed

6    to like Mr. White and Mr. Byrd being on the receiving end of

7    having and driving these high end vehicles, like a $75,000

8    BMW.

9         The length of involvement for Mr. Byrd actually seems

10   to support the high guideline range.  The extent of his

11   involvement does and again the presence of the firearms,

12   though not included as actual guideline factor, it's not to

13   suggest that these type of activities where you're talking

14   about transporting these huge sums of cash and huge sums of

15   marijuana do not involve danger, do not present danger to the

16   community.

17        THE COURT:  Thank you.

18        MR. GILMER-HILL:  Your Honor, the impact on the

19   community of this type of activity is not as lighthearted as

20   Mr. Fishman suggests.  I mean, earlier this month, last week

21   when Mr. Johnson himself was sentenced, he spoke to his

22   struggles with regard to marijuana , the fact that even while

23   having a pending federal case he couldn't resist the urge to

24   smoke marijuana and thus having had multiple violations.

25   Here, today, Mr. Fishman has represented that Mr. Byrd,

1    himself, needs marijuana treatment.

2         The drug trafficking trade has a corrosive impact on

3    our community.  And the fact of the matter is that the

4    community hears what happens in these cases.  A lot of which

5    you heard at the trial, a lot of what's happened in this case

6    is reflective of how quickly information does travel within

7    these circles.  If you remember -- and this was one of the

8    significant aspects even connecting Mr. Byrd to the conduct in

9    Arizona, Mr. McWherter testified that -- I believe he -- yeah,

10   actually he did.  Because I have the transcript if counsel or

11   the Court wants to look at it.

12        Mr. McWherter testified that he had spoken with D and

13   D told him that D's brother, who we know from the trial as

14   Smokey, had passed with cancer.

15        THE COURT:  Right.

16        MR. GILMER-HILL:  And that because of that, D was

17   going to -- actually for a period of time prior to that, D had

18   not been as heavily involved because he was concerned about

19   him caring for his brother and then attending the funereal.

20   As D told Mr. McWherter, Shoun's going to be in Arizona.

21        THE COURT:  Right.

22        MR. GILMER-HILL:  Mr. McWherter knew about Smokey and

23   his cancer by word of mouth even independent of D.  There's

24   many aspects throughout this case where information was known

25   to the defendants by word of mouth.  Mr. Byrd's having had a

April 10, 2017                                                    34

```
 1   DUI in Atlanta.  His speeding tickets in Arizona.  All of it
 2   by word of mouth.  And so the same word of mouth will get word
 3   out into the community as to the consequences of --
 4           THE COURT:  Oh, you're going to the deterrent effect.
 5           MR. GILMER-HILL:  Yes.
 6           THE COURT:  Okay.
 7           MR. GILMER-HILL:  Yes.  The consequences of large
 8   scale drug trafficking.
 9           THE COURT:  Okay.
10           MR. GILMER-HILL:  It's not like people are not aware
11   and watching.  The courtroom here is near full.  People in the
12   community do pay attention.  They do notice when someone
13   receives a heavy sentence for drug trafficking.  So they say
14   that's not -- so people in the community say that's not a risk
15   that I am willing to take.  That's a message of deterrence
16   that needs to be reinforced here.  There's no similarity
17   between --
18           THE COURT:  So what is the sentence that the
19   Government is seeking to achieve that deterrent effect?
20           MR. GILMER-HILL:  Your Honor, the Government would
21   request a guideline range sentence.
22           THE COURT:  Okay.
23           MR. GILMER-HILL:  And recognizing that the guideline
24   here or the bottom of the guideline is 324 months.  And that
25   is a sizeable sentence.  But Mr. Byrd's involvement is
```

April 10, 2017                                                    35

1   sizable.  The amount of drugs involved here is sizeable.  The

2   impact on the community is sizeable.  And there's a sizeable

3   difference between Mr. Byrd and someone like Mr. Johnson who,

4   himself, received a ten-year sentence.

5           The suggestion that Mr. Byrd and Mr. Johnson should

6   receive the same sentence is a surprising suggestion.  And not

7   in -- the Government would suggest not an appropriate sentence

8   for Mr. Byrd.

9           THE COURT:  Okay.  Thank you.  Would you wish to wrap

10  up?

11          MR. GILMER-HILL:  The Government would request a

12  sentence at the bottom of the guideline range.  Thank you.

13          THE COURT:  Okay.  Thank you.  All right.  Well, let

14  me indicate something -- Mr. Byrd, do you wish to address the

15  Court?  Do you have anything you'd like to say?  And you're

16  not required to say anything.

17          THE DEFENDANT:  No.

18          THE COURT:  Okay.  Well, I want to indicate that

19  based on the presentence report as well as the sentencing memo

20  in the consideration of the objections, that the offense level

21  in this case is what's set forth in the presentence report of

22  41 with a criminal history category of one.  And that leads to

23  a guidelines range of 324 to 405 months.  I am aware that the

24  guidelines are advisory and that I have the authority to

25  depart upward or downward and likewise to vary for appropriate

April 10, 2017

1    reasons set forth on the record.

2         The Court will now turn to the imposition of the

3    sentence.  I am required by statute 18 U.S. Code 3553(a) to

4    impose a sentence that is sufficient but not greater than

5    necessary to achieve the statutory objective.  And they apply

6    as follows.

7         Section (a)(1) requires the Court to consider the

8    nature and circumstances of the offense as well as the history

9    and characteristics of Mr. Byrd.  Mr. Fishman has spoken today

10   and before in this case indicating that this is a, quote,

11   unquote, weed case not worthy of such high guidelines.  It is,

12   in deed, a weed case in the sense that the case was about the

13   distribution of massive quantities of marijuana onto the

14   streets of Detroit and surrounding areas, I presume, for sell

15   at a significantly higher price than it was purchased from a

16   source in Mexico so that members of the conspiracy could make

17   thousands upon thousands if not millions of dollars without

18   the inconvenience of paying income taxes, social security for

19   its employees and distributors, and so on.

20        So yes, it is, in deed, a weed case.  But it is one

21   that involved dodging authorities, transporting thousands of

22   pounds of marijuana across the country and millions of dollars

23   in the other direction.

24        Although the case itself does not involve weapons,

25   these things can just simply cannot be accomplished without

April 10, 2017                                      37

1   either violence or the threat of violence somewhere along the
2   path.  And I think Mr. Gilmer-Hill's reference to the
3   corrosive impact of large scale drug -- unlawful drug trade is
4   worth noting.  And I think that I have seen some of that in
5   the other cases that I've handled as well.  But the weapons
6   here that belong to Mr. Byrd were lawfully owned, and I think
7   Mr. Fishman is right to point that out.  And so that's not
8   being held against him in any way.
9         Mr. Fishman also argues that marijuana is now
10  consumed lawfully and for recreational purposes in many, many
11  states and for medical purposes in at least 36 other states.
12  And here's the problem for me, which is that I don't make --
13  as you acknowledged, I don't make the laws in this country.  I
14  don't write the sentencing guidelines.  I'm required by law to
15  accept what Congress has determined is to be a crime.  And I'm
16  required to calculate the guidelines according to the
17  Sentencing Commission's process.
18        If left to me and if I knew more than I know now,
19  most likely marijuana would be lawful in all states and
20  regulated so that there need not be a market such as the one
21  that developed here and that these defendants tapped into and
22  made so much money from.  But that's not the reality of where
23  we are and it's not obviously how the system works.
24        But that said, I may be as frustrated as defense
25  counsel about the guidelines here and about the mandatory

April 10, 2017                                                 38

1    minimum starting at ten -- well, being ten years.  So I do

2    want to discuss that to a certain extent, which is that if we

3    were to be going grocery shopping or shopping for anything and

4    we're told that something is -- let's just go shopping for a

5    Rolex watch.  And we're told it's $10,000 in one store but

6    there's one on sell for $5,000.  Well, I'm going to buy the

7    $5,000 one.

8            I go to another store and they're all $5,000 but

9    there's one that's $10,000.  Well, I'm still going to -- I

10   guess what I'm trying to say is I think we have inflated the

11   mandatory minimum so horribly high on this particular offense

12   that it's very difficult to believe that that's not sufficient

13   but not greater than necessary.

14           I do think though that there is an important

15   difference in this case, which is that people had different

16   roles in the case.  And so I think that that does, according

17   to the statute, need to be acknowledged.

18           In terms of Section (a)(2)(A), the sentence needs to

19   reflect the seriousness of the offense and promote respect for

20   the law.  I don't really know what promotes respect for the

21   law.  That's a very difficult thing to address.  The

22   seriousness of the offense is addressed by Congress in setting

23   the mandatory minimum of 120 months.  And in terms of

24   deterrence, that is also addressed with such a very high

25   sentence.

1           In terms of the need to protect the public from any

2     further crimes from Mr. Byrd, I think Mr. Fishman has made a

3     very good point that there's been an extended period of some

4     seven years from when this conduct stopped when Mr. Byrd has

5     not engaged, so far as any of us know, in any unlawful

6     conduct.  So there does not seem to be a need for

7     incarceration for that purpose.

8           In terms of Section (a)(2)(D), providing Mr. Byrd

9     with needed educational or vocational training, medical care,

10    or other correctional treatment, the Court will certainly

11    include a recommendation to the Bureau of Prisons for the drug

12    treatment -- for evaluation of drug treatment.  And the kinds

13    of sentences that are available, although I appreciate that

14    the guidelines are advisory, they don't give me much leeway

15    here in terms of there being a mandatory minimum.

16          In this last Section (a)(6), which I was making

17    reference to before, requires the Court to try to avoid

18    unwarranted sentencing disparities among individuals with

19    similar records who've been found guilty of similar conduct.

20    That's also very difficult at the trial court level.  I know

21    this case and I heard the evidence in this case.  And I was

22    appalled by what was happening in terms of the potential

23    danger to so many people involved with such a massive

24    undertaking in terms of transporting that quantity of money

25    and that quantity of drugs I think is quite dangerous and/or

1   undoubtedly measures taken to make sure that that money wasn't

2   stolen or likewise the drugs stolen.

3         So pursuant to the Sentencing Reform Act of 1984,

4   having considered the sentencing guidelines and factors, the

5   Court hereby commits Mr. Leshoun Byrd to the custody of the

6   Bureau of Prisons for a term of 126 months on both counts to

7   run concurrently.

8         So it's six months above the mandatory minimum, which

9   I believe communicates the higher role that Mr. Byrd played

10  without -- from Mr. Johnson, who received 120 months, and

11  therefore takes into consideration factor (a)(6), the need to

12  avoid unwarranted sentencing disparities.  Although I

13  understand that's a national consideration, it still has to

14  have some effect here in this case.

15        Upon release from custody, Mr. Byrd, you will be

16  placed on supervised release for a term of five years on Count

17  1 and three years on Count 3 to run concurrently.  So a total

18  of five years.  You're further ordered to pay a special

19  assessment of $100 per count for a total of $200.  And that's

20  due immediately.

21        The Court will waive the imposition of a fine, the

22  cost of incarceration, and the cost of supervision due to your

23  lack of financial resources.  And while in custody, you will

24  be required to participate in the inmate financial

25  responsibility program.  And then you will -- the Court will

April 10, 2017                                         41

1   approve any payment schedule from this program.  And you will

2   be ordered to comply with that.

3           Mandatory drug testing will be ordered but only to

4   the extent the probation department thinks it necessary at the

5   time.  While on supervision, you will also be required to

6   abide by what are considered the standard conditions of

7   supervision in the Eastern District of Michigan.  And there

8   will be a special condition which is that you would be

9   required to participate in a program approved by the probation

10  department for substance abuse if they determine that that's

11  necessary.

12          You would also be required to provide the probation

13  department officer access to any requested financial

14  information and to submit yourself, your residence, office,

15  vehicles, papers, business or place of employment and any

16  property under your control to a search if, in deed, there is

17  reasonable suspicion that contraband or evidence of a

18  violation of a condition of release would be found there and

19  such a search would take place at a reasonable time and

20  manner.

21          I think those are actually quite rare.  But in light

22  of the fact that this case had such high amounts of money and

23  contraband, I think that this is an important condition to add

24  to this.  Failure to submit to such a search would be grounds

25  for revocation of your release.  And you would also be

1    required to warn any residence or that sort of thing that you

2    could be subjected to such a search.

3         Now, we have the conditional -- the preliminary order

4    of forfeiture still to address.  And Ms. Beck, do you wish to

5    say more?  I thought that -- I think the quantity of money

6    that the Government is seeking is well justified and very

7    conservative in terms of the money -- the forfeiture money

8    judgment.  Is that the terminology?

9         MS. BECK:  Yes, your Honor.

10        THE COURT:  Because I heard McWherter and Hale

11   estimate to me or estimate for the jury the number of trips.

12   I mean, they might have been uncertain as to whether it was 21

13   trips back and forth or 20 or 22.  I mean, they had that level

14   of uncertainty.  But not was it 1 or was it 2, which is what

15   it would have to have been for Mr. Fishman's argument to carry

16   today.

17        So maybe what I need to do -- because I don't think

18   the Government in any way waived their right to seek

19   additional money judgment because they returned $50,000 from

20   the sell of whichever property.

21        MR. FISHMAN:  The McLean.

22        THE COURT:  McLean.  McLean, yeah.  So do you want to

23   address that further , Mr. Fishman?

24        MR. FISHMAN:  Well, just a couple of things.  Look,

25   the argument, in a sense, is really -- it's like a letter I

1    got from a guy in the penitentiary years ago.  It said money

2    is no object.  I have none.  The amount you do, all it's going

3    to be is when Mr. Byrd comes home and goes to work -- maybe

4    they'll be around and I'll be dead by the time he comes home.

5          But maybe they'll be around and then they'll come

6    after his money working for Roto Rooter.  I don't know.

7    However many million trips they said they made, most of those

8    were made between 2006 and 2009 before Mr. Byrd joined the

9    conspiracy.

10         THE COURT:  Well, we don't exactly know that in the

11   sense that the condominium in Detroit was rented -- was leased

12   or purchased I guess in 2008.  I mean we don't know -- or was

13   it even before then, '7.  We don't know for -- there was not

14   enough sworn testimony for my liking to tell me that you're

15   right that he didn't enjoin this endeavor until '09.

16         MR. FISHMAN:  I can tell you one thing from listening

17   to the Court at the sentencing hearing, this is one of those

18   situations where whoever the defendant was who went to trial

19   didn't do anybody any favors, including herself.  That's my

20   commentary on that.

21         With respect to what they did of giving back the

22   50,000, it's just kind of an odd way to proceed.  I don't

23   blame Ms. Beck.  I don't blame Mr. Grey either.  But my guess

24   is from my conversations with Mr. Grey when he were

25   negotiating, it never crossed his mind that they were going to

April 10, 2017                                        44

```
 1    seek a money judgment.  Because I can't imagine they would
 2    have said, sure, take the 50,000.
 3            They could have kept the lien on the house and sold
 4    the house for the same 170 grand that it sold for then.  I
 5    don't think it -- I haven't had somebody ask for a money
 6    judgment in so long I forgot that they even existed until Ms.
 7    Beck contacted me.
 8            THE COURT:  Okay.
 9            MR. FISHMAN:  But that's the way it is.  And as I
10    say, you can't get blood out of a stone.  If the Court wants
11    to do it, I just want him to get credit for the 122,000 that
12    they took from the house.  I think Ms. Beck conceded that.
13            THE COURT:  Yeah.  And I'm not trying to get blood
14    out of a stone either.  I'm trying to follow the law.  And I
15    think that the Government has made a convincing argument.  And
16    it was agreed upon at the guilty plea that there would be --
17    if I'm not mistaken during the plea I acknowledged that
18    forfeiture was part of the indictment.  And your client
19    agreed.
20            MR. FISHMAN:  I mean, well, there wasn't any doubt it
21    was part of the indictment.  It was in the indictment.
22            THE COURT:  Yeah.
23            MR. FISHMAN:  So he couldn't disagree with that.  But
24    we didn't agree to anything other than the plea.  I understand
25    and he understands.
```

```
 1              THE COURT:  Okay.  So Ms. Beck, I think that the
 2    amount -- I did not -- I have it only on the computer.  What
 3    is the exact amount that the Government is seeking?
 4              MS. BECK:  Thank you, your Honor.  We ask for
 5    $250,000 with credit for the 122,000 that's already been
 6    forfeited from the sell proceeds of 903 McLean.
 7              THE COURT:  Okay.  And that leads to --
 8              MR. FISHMAN:  128 by my Mumford High School
 9    arithmetic.
10              THE COURT:  128.  It sure does.  So if you would
11    submit a proposed order that preliminary order of forfeiture
12    will be entered.
13              MS. BECK:  Thank you, your Honor.  If I might just
14    one last thing.  Pursuant to Rule 32.2, forfeiture must also
15    be included in the judgment and commitment order.  And I am
16    happy to email the Court with some general language for that
17    purpose.
18              THE COURT:  That will be very helpful.
19              MS. BECK:  Thank you, your Honor.
20              THE COURT:  I think actually the probation
21    department --
22              MS. BECK:  Oh, that's right.
23              THE COURT:  -- are now handling a draft of the
24    judgment and commitment order.
25              MS. BECK:  Thank you.
```

April 10, 2017

```
 1              THE COURT:  But you can send it to both of us.  Mr.
 2    Byrd, if I'm not mistaken -- you have an 11-year-old son?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  And I -- it is my sincere hope that there
 5    will be a way that you can maintain contact with your son
 6    during this extraordinarily long period of incarceration.  And
 7    what I have learned is that parents who write their minor
 8    children letters, it assists both the child in learning to
 9    read and expanding their vocabulary.  And it's staying
10    connected and having a physical presence or representation of
11    their parent.
12              And I wish I could include that in the judgment here
13    that I order you to write to your child.  But I know I don't
14    need to do that and I can't do it.  But I have learned that,
15    I've read, I've talked to parents and to children who've
16    received those letters and it's been extraordinarily
17    meaningful to them.  So I just -- I mention that to you.
18              And clearly this was some error in your own judgment.
19    And I -- to participate in this large scale conspiracy.  But I
20    truly believe we're all more than the worst thing we've done.
21    And this is one of those things where it's evident from the
22    seven years since this conduct ended that you have a great
23    deal to contribute to the community.  And so that does not go
24    without an important acknowledgment.
25              And the other thing that I have learned about
```

April 10, 2017                                                        47

1    extended periods of incarceration is that if on the day you

2    report to the Bureau of Prisons you begin to plan your reentry

3    into the community, it will ultimately go all the better for

4    you.  I don't know how many of the people here are here to

5    support you, but I presume many of them are.  And I read in

6    the presentence report that you have the love and support of

7    family.  And so I just commend you for that and hope that you

8    can stay in touch.

9            There's no plea agreement, so we don't have any

10   counts to dismiss.  Count 2.  But is there any objection from

11   the Government or from Mr. Fishman to the sentence that has

12   been pronounced that's not already been set forth?

13           MR. GILMER-HILL:  Nothing from the Government, your

14   Honor.  Of course, there is the right to appeal to advise Mr.

15   Byrd of.

16           THE COURT:  Certainly.

17           MR. FISHMAN:  We have nothing and we would ask that

18   the Court recommend Morgantown in your recommendation.

19           THE COURT:  Morgantown?

20           MR. FISHMAN:  Yes.  It's an FCI there.

21           THE COURT:  Okay.  The Court will recommend

22   Morgantown.  And does it have a drug treatment.

23           MR. FISHMAN:  It does.

24           THE COURT:  Mr. Byrd, you have a right to appeal this

25   sentence if you think it's somehow procedurally or

April 10, 2017

48

```
1    substantively invalid.  And you must do so within 14 days of
2    entry of the judgment.  If you cannot afford a lawyer, a
3    lawyer would be appointed for you.  If you cannot afford one,
4    as I think I just said.  So I think that will conclude this
5    hearing.
6                MR. GILMER-HILL:  Thank you, your Honor.
7                MR. FISHMAN:  Thank you.
8                MS. BECK:  Thank you.
9                     (Proceedings Concluded)
10                    -           -           -
11
12              CERTIFICATE OF OFFICIAL COURT REPORTER
13          I, Jeseca C. Eddington, Federal Official Court
14    Reporter, in and for the United States District Court Eastern
15    District of Michigan, appointed pursuant to provisions of Title
16    28, United States Code, Section 753, do hereby certify the
17    foregoing 48 pages are a true and correct transcript of the
18    proceedings had in the matter of UNITED STATES OF AMERICA
19    versus LESHOUN BYRD, Case No. 15-20040 held on April 10, 2017.
20
21    /s/ JESECA C. EDDINGTON                        5/14/2017
      Jeseca C. Eddington, RDR, RMR, CRR, FCRR       Date
22    Federal Official Court Reporter
23
24
25
```